IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NOS. 4:21-CR-00456-3 |
| | § | 4:21-CR-00456-4 |
| VERSUS | § | 4:21-CR-00456-6 |
| | § | HOUSTON, TEXAS |
| CHARLES DAWSON (3) | § | TUESDAY, |
| DAMON RANDOLPH (4) | § | OCTOBER 19, 2021 |
| KIYON MARSHALL (6) | § | 9:03 A.M. TO 9:40 A.M. |

**ARRAIGNMENT AND DETENTION HEARINGS**

BEFORE THE HONORABLE SAM S. SHELDON
UNITED STATES MAGISTRATE JUDGE

| | |
|---|---|
| APPEARANCES: | SEE NEXT PAGE |
| ELECTRONIC RECORDING OFFICER: | SIERRA THOMAS |
| COURTROOM CLERK: | SHANNON JONES |

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES:**

FOR THE PLAINTIFF:          US ATTORNEY'S OFFICE
                            Jame Donald McAlister, Esq.
                            1000 Louisiana Street
                            Suite 2300
                            Houston, TX  77002
                            713-567-9573


FOR CHARLES DAWSON:         ATTORNEY AT LAW
                            Lance Craig Hamm, Esq.
                            1200 Rothwell Street
                            Houston, TX  77002
                            713-659-5377


FOR DAMON RANDOLPH:         THE MONTALVO LAW FIRM, PLLC
                            Gerardo S. Montalvo, Esq.
                            Park Central Plaza
                            1111 North Loop West
                            Suite 820
                            Houston, TX  77008
                            713-526-5002


FOR KIYON MARSHALL:         HOCHGLAUBE & DEBORDE, PC
                            Molly Bagshaw, Esq.
                            3515 Fannin Street
                            Houston, TX  77004
                            713-526-6300

**INDEX**

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| NICHOLAS ANTHONY WILLIAMS | | | | |
| By Mr. McAlister | 8 | . | 24, 32 | . |
| By Mr. Hamm | . | 13 | . | . |
| By Mr. Montalvo | . | 17 | . | . |
| By Ms. Bagshaw | . | 21 | . | . |

| EXHIBITS: | Marked |
|---|---|
| Exhibit 1 | 31 |
| Exhibits 3 and 4 | 7 |

\*\*\*

**HOUSTON, TEXAS; TUESDAY, OCTOBER 19, 2021; 9:03 A.M.**

THE COURT:  Okay.  H-21-456, United States versus Charles Dawson.

MR. HAMM:  Good morning, Judge.

I'm present for Mr. Dawson.

THE COURT:  Okay.  Good morning, Mr. Hamm.

And where's Mr. Dawson?

MR. HAMM:  He's right here.

THE COURT:  Okay, great.

And then, Damon Rudolph [sic].

MR. MONTALVO:  Gerry Montalvo for Mr. Randolph, Your Honor.  He's present.

THE COURT:  Good morning.

And Kiyon Marshall.

MS. BAGSHAW:  Good morning, Judge.

Molly Bagshaw, present for Kiyon Marshall.

THE COURT:  Okay, great.

And Mr. McAlister's here for the Government?

MR. MCALISTER:  Yes, Your Honor.

THE COURT:  Okay.  So, who are we going to call, Mr. McAlister?

MR. MCALISTER:  Your Honor, I have two things to bring before the Court, first.

THE COURT:  Sure.

MR. MCALISTER:  I'd like to make a Motion in

Limine.  One of the Defendants is still at large here, and that this time, the Government is not prepared to disclose how we know some of the information being presented to the Grand Jury.  I'm happy to present the facts to the Court as I've done in the summary, and then I have a witness who participated in the arrests who can certainly be asked about a few of the questions.

THE COURT:  Sure.

MR. MCALISTER:  But just as to the disclosure issue of how we know some of the information, at this time, we're not prepared to disclose it.

THE COURT:  Okay.  So, before I have the Defense respond, two things:  One, we're here just on a detention hearing.  The case was indicted.  So, a Grand Jury has already found probable cause.  So, I wasn't intending upon the witness to get into a probable cause hearing.

I do think it's fair that you all have the opportunity to cross-examine the agent, but as Mr. McAlister said, at this point, I'm not going to require the agent to reveal any names, especially because there's safety issues and we're not here on a probable cause hearing.

The second thing for the Defendants, too, which I'm sure the attorneys already went over, that, because this is a presumption case, the burden has shifted upon you to show that there's no condition or combination of conditions

to reasonably assure your appearance or the safety of the community.

So, why don't we do this, Mr. McAlister?  Why don't you just put on the agent?

MR. MCALISTER:  Yes, Your Honor.

THE COURT:  He'll give a summary, a short summary as to each Defendant, and then I will allow cross-examination, but I'm going to cut off the cross-examination if we get too far into the facts.

Once we swear in the agent, we'll admit the Pretrial Reports as exhibits.

So, Shannon, you want to swear him in?

THE CLERK:  Yes, Your Honor.

Can you raise your right hand, please?

(The Witness sworn.)

THE CLERK:  Okay, you may be seated.

THE COURT:  Before -- any objection to Mr. Dawson's Pretrial Report being admitted?

MR. MCALISTER:  None by the Government, Your Honor.

MR. HAMM:  No, Your Honor.

MS. BAGSHAW:  No, Your Honor.

THE COURT:  Okay.

Any objection to Mr. Rudolph's Pretrial Report being admitted?

MR. MONTALVO:  No, Your Honor.

THE COURT:  And then, any objection as to Mr. Marshall's, the original and then the -- the original will be Exhibit 3 and the amended being Exhibit 4?

MS. BAGSHAW:  No, Your Honor.

THE COURT:  Okay.

Go ahead, Mr. --

MR. MCALISTER:  Your Honor, I also provided summaries to the Defense and to the Court regarding the fact scenarios in this case, and I --

THE COURT:  Okay.

MR. MCALISTER:  I have a copy for them.

THE COURT:  Sure.  I have that, too.

MR. MCALISTER:  Okay.  Thank you, Your Honor.

THE COURT:  Did you want to admit that, or did you --

MR. MCALISTER:  If the Defense has no objections. If they do, then I'm fine with not admitting it.  That's going to be the source of the information for this Defendant, if the Defense needs to see his notes for review.

THE COURT:  Okay.

Any objection to admitting that?  That would be Exhibit 5.

MR. HAMM:  None for Mr. Dawson.

MS. BAGSHAW:  No, Your Honor.

MR. MONTALVO:  No, Your Honor.

THE COURT:  Okay.

Go ahead, Mr. McAlister.

MR. MCALISTER:  May I proceed, Your Honor?

THE COURT:  Yes.

DIRECT EXAMINATION OF NICHOLAS ANTHONY WILLIAMS

BY MR. MCALISTER:

Q    Agent Williams, could you please state your full name for the Record?

A    Nicholas Anthony Williams.

Q    And how are you employed?

A    By the Federal Bureau of Investigations, Special Agent.

Q    Were you a participant in the arrest and planning of the arrest of a Mr. Dawson, Mr. Randolph, and Mr. Marshall?

A    That's correct.

Q    Okay, and was it your understanding that this arrest was based on an Indictment and warrants that had already been issued pursuant to the Grand Jury finding of true?

A    Yes, that's correct.

Q    Do you have any information about the facts that were in the Indictment?

A    Only facts that I'm aware of are the summary that was provided --

Q    Provided to you?

A    -- by case agent and yourself, sir.

Q     Could you tell this Court a little bit about the summary -- and I want to begin on December 8th of 2018. Were you aware that six men participated in a robbery and murder?

A     Yes, that's correct.

Q     Okay, and was the victim's name Quentin Roach?

A     Yes, correct.

Q     And did that robbery take place at what we all believe to be a drug warehouse, and Mr. Roach was a drug dealer?

A     Yes.

Q     We had information that was presented regarding the roles of the Defendants in this case, and can you just tell the Court briefly what were the roles that we believe to be of Mr. Dawson, Marshall, and Randolph?

A     As far as roles --

Q     What they did as far as the robbery?  Like, was one of them a getaway driver, one of them pick up the property, you know?

A     From what I understand, again, from the summary, and I'm reading just directly from the summary.  I want to make sure that I don't provide any alternative information that was provided to me, but Mr. Dawson, Mr. Marshall, and Mr. Randolph, they entered the warehouse and opened fire on Mr. Roach.  It's understood that -- let me see here.

Q     And was there one car that was used to pin Mr. Roach's

vehicle in the warehouse?

A    Yes.

Q    We believe that was driven by a Mr. Hubbard?

A    Yes, that's correct.  Yes, that's correct.

Q    And then, we believe Prince, Dawson, Marshall, and Randolph -- and those are the last names for the Record -- entered the warehouse and opened fire on the vehicle?

A    Yes, that's correct.

Q    Okay.  Now, to be fair, after the shooting, we only found three sets of different casings.

A    Yes.

Q    So, of those four people, we believe three of them were shooters?

A    Yes, it's understood that three different weapons were used.

Q    Okay, and we believe this was a drug warehouse because during a search, we found crack cocaine and other drug paraphernalia in that location?

A    Correct.

Q    And then, there was another individual named Cutis Sandel, that we believe he was the lookout driver, right?

A    Yes, that's correct.

Q    And this resulted in an Indictment against these Defendants for robbery under the Hobbs Act, which carries a 20-year punishment, correct?

A    Uh-huh.

Q    Conspiracy to distribute cocaine because it's believed they took drugs from that warehouse with the intent to resell them?

A    Yes.

Q    And then, Counts 2 and 4 are using a gun during this crime of violence and drug trafficking, which each of those carries a 10-year minimum sentence, and they must run consecutive?  In other words, they must be stacked onto the other offenses, right?

A    That's correct.

Q    So, these Defendants are facing about 30 years in prison if all of these offenses are found to be true?

A    Correct.

        BY THE COURT:  A minimum of 30 years?

        MR. MCALISTER:  If all the counts are found to be true, Your Honor.

BY MR. MCALISTER:

Q    You participated in the arrest of these Defendants, correct?

A    That's correct.

Q    Okay.  We talked about Mr. Dawson and Mr. Randolph.

        Were there any issues in the arrest, any problems?

A    With Mr. Dawson and Mr. Randolph, no, sir.

Q    Okay.

Tell the Court, were there any issues with the arrest of Mr. Kiyon, K-I-Y-O-N, Marshall?

A    So, I was not present at -- all three of the arrests that we're speaking of happened simultaneously.  So, I was only present for the one separate arrest, but the information that was passed on to me was from SWAT operators conducting the arrests.

Q    And all the teams had SWAT with them, correct?

A    That's correct, that's correct.

Q    Okay, proceed.

A    Mr. Marshall was -- they made contact with him at his home residence.  SWAT, typical procedures, announced their presence at the door multiple times, minutes -- I don't have an exact count of how long it took.  Diversionary devices were used.  This is often used to simply wake someone up.

Q    And stop for a second.

Is that the same as a flash bang?

A    Yes, correct.

Q    Okay.

So, it makes noise, but it doesn't hurt anybody?

A    That's correct.

Contact was made. Verbal contact was made with the individual at his bedroom window.  There was -- I'm not familiar -- I'm not understanding what the conversation was like, but it was understood that he was not going to exit

the house.  The --

Q    Now, did the entry team go in at this time, or did they stay outside?

A    They had not.  They had not gone in yet, they had not gone in.

Q    And as one of the arresting officers, was that part of y'all's plan, not to go in these houses with these individuals?

A    Yeah, that is correct.  Due to the anticipated level of danger to the subject and as well as fellow officers, it's usually a last resort to make entry into the house.

So, again, contact was made through the bedroom window before there was an acceptance that he was going to comply with officers' commands, and therefore, he was then taken into custody.

BY MR. MCALISTER:  Okay, and we've talked about the criminal histories on these Defendants, but that information is already in the Pretrial Reports.

The Government will pass the Witness, Your Honor.

THE COURT:  Okay.

Go ahead, Mr. Hamm.

CROSS-EXAMINATION OF NICHOLAS ANTHONY WILLIAMS

BY MR. HAMM:

Q    Special Agent Williams, couple of questions for you.

You arrested Mr. Dawson pursuant to a warrant?

A    Yes, correct.

Q    And where did you arrest him at?

A    This was Mr. Randolph?

Q    Mr. Dawson.

A    Oh, Mr. Dawson?

Q    Yes.

A    So, Mr. Dawson was arrested at a residential location.

Q    Do you recall the time that you arrested him?

A    Around 6:30 in the morning.

Q    And obviously, you guys were there -- did you wake him up, surprise him?

A    Yes, that's correct.  Yes.

Q    Did you have any issues getting inside the home or apartment, whatever residence he was at?

A    I don't believe they entered the home.  I believe he was just taken into custody at his doorway.

Q    Okay.

Did they find any weapons on him?

A    No, sir.

Q    They find any ammunition or anything?

A    There was not a search conducted of the home, but on his person, no, sir.

Q    No drugs or anything else?

A    No.

Q    Now, I want to briefly ask you, according to the

information you have, in your participation, Mr. Randolph or, excuse me, Mr. Dawson was cooperative?

A    Yes, yes.

Q    He didn't try to flee or anything, correct?

A    Yes, correct.

Q    He didn't provide any untruthful information at that moment?

A    No.

Q    You have other information concerning the events outside of the Government's summary that you testified to.
Is that right?

A    I wouldn't say that I have any information further than what's provided in the summary.

Q    There were three guns or there were three casings found at the scene?

A    Yes, three different casings.

Q    Were there any casings found at or around Mr. Roach's body?

A    I would not know that information.

Q    Do you know whether or not there was a weapon found with Mr. Roach?

A    I don't know.

Q    Drugs -- there were also -- do you know how much drugs were allegedly taken by Mr. Dawson from the warehouse?

A    No, sir, I do not know that.

Q    But there were drugs that were found, 10 pounds, I believe, and some other drugs, still found at that location, correct?

A    Correct.

Q    All right.  So, there's really not enough information to suggest that there were drugs taken from the warehouse, but we know there were drugs located at the warehouse.

Is that accurate?

A    That is correct.

Q    Now, let me ask you what -- the make and model of the vehicle that Mr. Dawson was supposed to have left the warehouse in, do you know that information?

A    I do not know.

Q    Was there surveillance used from inside No. 311 used to identify Mr. Dawson?

A    I do not know that answer.

Q    Do you know whether or not there was surveillance at, I think, it was 15108 Lee Road?

A    No, I do not know.

Q    So, to your knowledge, the information that was used to even suggest Mr. Dawson had something to do with this came from, and we don't name them, but independent, for lack of a better word, cooperators?

A    I don't know, sir.

Q    Okay.

A    I don't know where all the information came from.

Q    Do you know -- Mr. Hubbard is alleged to have blocked Mr. Roach's vehicle in according to the summary

Do you know whether or not that vehicle actually was registered to Mr. Hubbard?

A    No, sir, I do not know.

Q    Okay.

BY MR. HAMM:  May I have a moment, Judge?

THE COURT:  Sure.

And so, just to be -- now, that I'm seeing how this is progressing, for the Defense, one of the factors is the strength of the case.  I won't use that -- there's just not enough before me to -- so, there's other factors I can use in making a bond decision, but I'm not going to comment either way on the strength of the case.

MR. HAMM:  I pass the Witness, Your Honor.

THE COURT:  Okay.

Mr. Montalvo?

MR. MONTALVO:  Yes, Your Honor, thank you.

CROSS-EXAMINATION OF NICHOLAS ANTHONY WILLIAMS
BY MR. MONTALVO:

Q    Agent, you weren't involved with any of the investigation of this case, correct?

A    That's correct.

Q    So, you have no idea when -- do you know when the

Indictment was returned, because my document doesn't have a stamp?

A    I do not know.

Q    Okay.

     Do you know -- by speaking to other law enforcement about the case, do you know when the information provided in the summary was available to the Government?

A    Can you clarify?  I don't understand.

Q    Sure.

     The summary indicates that through cooperating people or through other sources, this information became available to the Government.

     Is that your understanding?

A    Uh-huh.  Yes, that's correct.

Q    Do you know how long ago that was?

A    From what I understand, it was around -- the date provided in the factual summary, December 8th, 2018, --

Q    Okay, that was --

A    -- I understand that's the date of the incident that we're looking at, but I don't know when that information became available to the Government.

Q    Okay.

     So, the alleged activity took place on December 18th, but you're not sure when all this information became available to the Government?

A     I do not know.

Q     Do you have -- did you participate in the arrest of Mr. Randolph?

A     Yes, I did.

Q     Okay.

      And I think you testified there was no issues with his arrest?

A     No.

Q     Did you do a sweep of the house or anything like that?

A     So, Mr. Randolph was not found at his house.  He was found at work.

Q     At work?

A     Yes.

Q     And so, he was working in the City of Houston?  Where does he work?

A     He works at -- it's called, from what I looked up on Google Maps, it's called The Reinforced Earth Company.  It was a -- I would say it was a steel mill.  It was an industrial park.

Q     Okay.

      So, clearly, you knew where Mr. Randolph worked?

A     Yes.  At the time, I was provided that information.

Q     Okay.

      Had you surveilled him there before prior to that day?

A     No.  No, sir.

Q     Okay.

And there was no problems in his arrest?  He didn't try to run, did he?

A     No, not at all.

Q     Didn't try to use force or anything against any of the --

A     No.

Q     Do you have any information for this Court that if he's released on a bond, that he won't show up to Court?

A     I don't have any information regarding that, no.

Q     Do you have any information for this Court that in any of his past cases, he's failed to appear in a court appearance?

A     No details on past -- I do understand just from the summary that he --

Q     Okay.  Okay, I'm sorry.

Are you talking about -- are you going to answer my question, or is that something else you're going to say?  I'm not sure what you're going to say, but are you talking about his criminal history or something?

A     It was just going to be a reference to criminal history, and that's the only information I was provided.

Q     Okay.

And again, you don't know if he -- you don't have

any information that he failed to appear in any of those?

A    I do not.

Q    And you didn't look at the Pretrial Report, did you?

A    I did not, no.

Q    So, did you have an opportunity -- you arrested him at work.

          You didn't have an opportunity to speak to his family?

A    I did not, no.

Q    And right now, today, you have no information for this Court that he'll fail to appear if he's let out on a bond, correct?

A    I don't have any information on that.

          BY MR. MONTALVO:  I'll pass this Witness.

          THE COURT:  Okay.

          Ms. Bagshaw?

          MS. BAGSHAW:  Thank you, Your Honor.

     CROSS-EXAMINATION OF NICHOLAS ANTHONY WILLIAMS

BY MS. BAGSHAW:

Q    Agent Williams, I'm wondering -- so, you mentioned that for Mr. Marshall, you were not present for his arrest?

A    No.

Q    Do you know around what time that arrest took place? Like, was it in the middle of the night?

A    It was early in the morning.

Q    So, it might have still been dark outside?

A    Yes, it was in the twilight hours.  Sun was coming up.

Q    And you indicated -- actually, I'll take my mask off.

BY MS. BAGSHAW:  Is that okay, Judge?

THE COURT:  Yes.

MS. BAGSHAW:  Thank you.

BY MS. BAGSHAW:

Q    You indicated that they used flash bangs, maybe to wake him up.

Is that right?

A    Yes, it's a -- I would say it's a common tactic. Initially, just lights and sirens by a marked unit outside will be used, maybe a speaker just addressing the individual by name, asking to please exit the residence.  So, a flash bang is just another measure to get someone's attention.

Q    So, but you were not there physically to know how exactly those conversations happened, correct?

A    I was not, no.

Q    Okay.

And it's your understanding that as soon as they made entry into the house and had direct contact with him, he didn't try to run out of the house?

A    Yes.  To my knowledge, that's correct.

Q    He didn't provide them with any false information?

A    No.

Q    Okay.

And as far as the underlying case, you mentioned that the evidence suggested there were three different shooters?

A    Yes.

Q    But you don't have any personal information about who potentially was a shooter for the Court?

A    I do not, no.

Q    And upon search of Mr. Marshall's home, there were no guns found in the home?

A    I don't believe that the home was searched, no.

Q    Okay.

But the agents or the arresting officers made entry into the home, correct?

A    Yes.  To take custody of the individual, yes.

Q    Okay.

So, they only had an arrest warrant, not a search warrant?

A    Correct.

Q    Understood.

And you don't have any details about Mr. Marshall's past for the Court, do you?

A    I only have a summary of his criminal history that was provided.

Q    But you wouldn't be able to shed light on his success

with any sort of pretrial or bond conditions in the past?

A    No, I don't know.  No bond conditions.  No, I don't.

Q    And you don't have any personal knowledge of his work history, or his family, or anything like that?

A    I do not, no.

BY MS. BAGSHAW:  No further questions, Judge.

THE COURT:  Okay.

So, is there anything else, Mr. McAlister?

MR. MCALISTER:  Just one --

THE COURT:  Sure.

MR. MCALISTER:  -- issue to clarify.

REDIRECT EXAMINATION OF NICHOLAS ANTHONY WILLIAMS

BY MR. MCALISTER:

Q    When you and the officers did your preparation for the arrests -- I just want to make it clear on the Record -- the first thing you did was not go to somebody's house and throw in a flash bang, was it?

A    No, no, no.

Q    What was the order to proceed in making the arrests?

A    And again, every situation is unique --

Q    Sure.

A    -- but there's a standard procedure on which -- you know, a loud sound will be used by a police car, you know, just to get someone's attention.

Q    And that's all I'm -- there was a knock and announce

required --

A    Yes.

Q    -- before all this took place, right?

A    Yes, yes.

Q    And that's either through speakers, lights, or knocking on the door?

A    Yeah.  Yeah, all three.

Q    And to your knowledge, that was done in all of these cases?

A    Yes, correct.

            BY MR. MCALISTER:  That's all I have, Your Honor.

            THE COURT:  Okay.

            So, let's start with Mr. Dawson.  I don't need -- the issue to me is the safety of the community.  It's not flight risk.  So, I don't need anybody to address that, unless -- Mr. McAlister, I think the issue is can they rebut the presumption on safety of the community and not flight risk.

            MR. MCALISTER:  It is, Your Honor, but I would point out to the Court that if you look at his criminal -- and we're talking Mr. Dawson, correct?

            THE COURT:  Okay.

            MR. MCALISTER:  He does have a prior for evading.

            THE COURT:  Okay.

            MR. MCALISTER:  And if the Court would look, he

had two instances in which he was placed on probation, and I can't tell if they were at the same time.  It was for an aggravated robbery and some type of a terroristic threat. He was placed on probation, and he couldn't follow the conditions.  And so, he was revoked.

In addition to that, if the Court would look, he had unsatisfactory termination of his bond conditions when he was placed on deferred for theft in 2014.

And then at the very bottom of his criminal history, on August 4th of 2018, he was arrested for engaging in organized criminal activity.  He was then placed on bond in August of 2018.  The conduct alleged here, we have probable cause to believe he was engaged in conduct in December of 2018.

So, he doesn't abide by the conditions of bond. Don't know if that exactly goes to flight risk, but certainly, to danger.

THE COURT:  And so we're clear, besides the August 4, 2018, there was also the April -- wasn't he on bond on the April 8th, 2018, case, too?

MR. MCALISTER:  I think he made bond on that case in 2019, Your Honor.

THE COURT:  Okay, got you.

MR. MCALISTER:  And so, I don't think I can represent that.

THE COURT:  Okay.

Go ahead, Mr. Hamm.

MR. HAMM:  Just briefly with a point on Counsel's argument that he, Mr. Dawson, is violating conditions of bond based on the allegation in this December of '18, based on the evidence that we've heard, I understand there's a Grand Jury Indictment; however, we don't have anything, I think, that the Court would be able to consider that suggests Mr. Dawson would not abide by any conditions that you put on him.

I do understand that case in August presents an issue, but Counsel made a point of bringing up an unsatisfactorily discharged, I believe it was a probation. However, in the event that he was on this pretrial release or bond conditions in State Court, there are no allegations that the Government has brought you that he violated any of those terms and conditions, and evidently made all of the court appearances, and so on.

So, I would just urge the Court that there are conditions that the Court could impose on Mr. Dawson that could assure his presence in court, ankle monitor, home arrest, some other things that could be done.

THE COURT:  Okay.

Anything else, Mr. Hamm?

MR. HAMM:  No, sir.

THE COURT:  So, Mr. Dawson, we're at the early -- he can step down.

So you understand, we're at the early stages of a criminal case.  There's been a Grand Jury Indictment.  The way the Grand Jury system works is you don't get an opportunity to present evidence before the Grand Jury.  So, the Grand Jury just hears the Government's side, and then it's a different burden of proof.  The burden of proof is probable cause, which is a lot less than beyond a reasonable doubt.

But the law requires that I follow what the Grand Jury has done, which means the Grand Jury's found probable cause that you were involved in the murder of another individual.  That doesn't mean that, ultimately, a jury beyond a reasonable doubt will make that decision, but for right now, for bond purposes, the burden's on you to show that there are conditions that would reasonably assure the safety of the community.

And unfortunately, because of the charge that you're facing, and as Mr. McAlister, the Government, said, that if convicted, you'd face a mandatory minimum sentence of 30 years, and due to your criminal history of prior aggravated robberies and the probation being revoked on those cases, I'm going to find that you haven't rebutted the presumption that there's conditions that I could set.  So,

you will remain in custody until further proceedings in this case.

Anything else, Mr. Hamm?

MR. HAMM:  Just that Mr. Dawson is, because of how it goes, is in the 21 day, is there a way I can speak with him prior to the Marshals taking him back?

THE COURT:  Can he speak in the cellblock?

PRETRIAL OFFICER:  All the visitation booths are open.

THE COURT:  Yes.

MR. HAMM:  Okay.

THE COURT:  Okay.

MR. HAMM:  That's all I have, Judge.

THE COURT:  Okay, thank you.

Okay.  As to Mr. Randolph, Mr. Montalvo?

MR. MONTALVO:  Your Honor, Mr. Randolph just has one conviction.  It was ten years ago when he was 18 years old.  It appears -- he doesn't have any violations on his -- no probation violations.  Clearly, he was working.  That's where they found him, at work.

We have his mother that he can live with.  We have his wife that he can live with.  They both agreed to sign a bond.  To address danger, we could put a bracelet on him.  He's working and supporting his family full-time.  So, we could have a curfew that would keep him at his house at

night.

So, I would ask the Court -- and again, I don't see any violations.  I have no idea what the pending cases are -- we barely have information about this case.  I have no idea what that past case is, but I do know he only has one conviction.  I think danger can be addressed with a bracelet and curfew.

THE COURT:  So, Mr. Rudolph [sic], Mr. Montalvo, I understand -- on this case, like I said, I'm not making any assessment on the strength of the case because we have -- all we know is the Grand Jury has found probable cause, but they found probable cause.  I mean, the facts are what they are: that there was a murder in this case, and that's one of the most serious crimes under federal law.

And Mr. Rudolph has a prior conviction for murder.  I understand it was 22 years ago, but what's also concerning now is that he was on a surety bond when this case is alleged to have occurred.  He was on bond for engaging in organized criminal activity.

So, for the same reasons as Mr. Dawson, I don't believe the presumption has been overcome, that there's any kind of conditions or combination of conditions that I could set that would reasonably assure the safety of the community.

So, Mr. Randolph will be remanded into custody for

further proceedings in this case.

Anything else, Mr. Montalvo?

MR. MONTALVO:  No, Your Honor.

THE COURT:  So, as to Mr. Marshall, before we get going, Ms. Bagshaw, so, Mr. McAlister, I'm sure you've received several letters that we'll -- I've reviewed them -- that we'll mark as -- any objection to marking those as Defense Exhibit 1?

MR. MCALISTER:  No, Your Honor.

THE COURT:  Okay.

(Defense Exhibit 1 marked for identification.)

THE COURT:  So, let me ask you this, Mr. McAlister.  As to Mr. Marshall, I know and I've looked at his criminal history, but it looks like after 2010, the last eleven years, he's turned his life around.  He's worked for the City of Houston continuously for nine years.

So, but then, we have the most serious crime being alleged committed.  So, my only issue is is that if his defense is going to be -- I don't know what his defense is going to be, but if his defense is going to be, "I wasn't there and this is mistaken identity," that's where I'm just a little unsure right now, because we have limited factual information, that if there was more information, then obviously, it's an easier call.  So, you tell me.

MR. MCALISTER:  May I supplement the Record?

THE COURT:  Sure, okay.

FURTHER REDIRECT EXAMINATION OF NICHOLAS ANTHONY WILLIAMS

BY MR. MCALISTER:

Q    Agent Williams, in addition to information that we have that was offered from witnesses that we're not prepared to disclose, are you aware that there was cellphone tracking that was done with these Defendants?

A    Yes.

Q    And the cellphones that were linked to each one of these Defendants were found in the location of the murder on the date that it took place.

Is that correct?

A    Yes.

Q    So, there is corroborating information in addition to testimony?

A    Uh-huh.

BY MR. MCALISTER:  In addition to that, Your Honor, if Mr. Marshall was truly a law-abiding citizen and he was prepared to, you know, follow his conditions as he's not been in the past, because he's been convicted at least three times and been to the pen at least three time, he still shouldn't be possessing weapons.

And in this report, he again tells the Court that he has a 9mm located in his residence.  The officers had difficulty getting him out of his residence.  They knocked

and announced.  He didn't show up.  They had to use flash bangs to get him out of there.

And luckily, this 9mm wasn't used, but he certainly shouldn't have been possessing a 9mm when he's a three-time convicted felon.  And we do not believe he's going to follow the conditions of bond set by the Court.

THE COURT:  Go ahead, Ms. Bagshaw.

MS. BAGSHAW:  Yes, Your Honor, thank you.

As far as Mr. Marshall goes, the Court has had the opportunity to read the many character letters that have been already admitted as Exhibit 1.  They talk about the many people who love and support Mr. Marshall, and how well he's done since returning home from his TDC time.

His mother, Joanne Marshall, is here today.  His daughter, Kiyona Marshall, is also here today.  He's extremely important in their lives.  He's worked for the City for nine years, worked his way all the way to become an inspector.  We can tell that there's limited information, and while we appreciate that, the Government has what they need to do, at the same time, we still have not heard enough information to understand that Mr. Marshall was really connected to this at all, as far as determining whether or not he's a danger to the community.

The only thing in his history about not complying with any sort of conditions is a failure to appear when he

was 17 years old, that he was never even convicted of.

We can have him on a monitor. He has a home that he can live in. He has family that he could live with, if that would suit the Court. He is going to be able to return to his job if that determination is made by Your Honor. And we would ask that even though it is a presumption case, based on the information that we've proffered, his criminal history, and the information in the Pretrial Report, there's simply not enough information that shows that he cannot be safely held in the community while we fight these charges.

Thank you.

THE COURT: So, this is a lot -- Mr. Marshall, his family, and Ms. Bagshaw, I mean, this is a lot tougher of a call for me, but on one hand you have the ultimate federal crime of a murder where the allegations presented to the Grand Jury is that these three gentlemen were there and they were all firing. So, it wasn't like one was the lookout driver, one was somewhere else, and they had a different role in the conspiracy. The Government's theory of the case is all three of them were shooters, and that they presented to a Grand Jury, and a Grand Jury returned an Indictment.

Again, I don't know the strength of the case, but that's what the Grand Jury found. On the other hand, Mr. Marshall does have criminal history that does have some violence, but it looks like, from the past eleven years,

he's turned his life around, but we still have the ultimate crime.

I think you've rebutted the presumption, but I think the Government has still presented enough evidence at this time.

What I'd like to do is, I think, once you get discovery, Ms. Bagshaw, that my ruling would be without prejudice that I don't have a problem once discovery -- if the case is really weak against him, then I would reconsider my decision.

So, my decision now would be that I'm not going to issue a bond, but you're going to get discovery in this case, and again, then I would make that decision without prejudice to come back before me once you know more of the facts in the case.

MS. BAGSHAW:  Yes.  Understood, Your -- can we clarify something --

THE COURT:  Sure.

MS. BAGSHAW:  -- for the Record about in the Indictment, I believe there's five listed names and we have three shell casings.  So, I just wanted to understand, to clarify.  We have three men here, three casings, but we have five people on the Indictment.

THE COURT:  Go ahead, Mr. McAlister.

MR. MCALISTER:  There's actually six --

THE COURT:  Okay.

MR. MCALISTER:  -- in the Indictment, Your Honor.

MS. BAGSHAW:  Okay, thank you for correcting me.

MR. MCALISTER:  Not everybody has been arrested.

MS. BAGSHAW:  Exactly, there you go.

MR. MCALISTER:  So, yes.

And the roles, as we defined, are not all the same.  For instance, Mr. Hubbard was driving the vehicle that did the blocking, Mr. Sandel was doing the surveillance on the outside, and we believe Mr. Prince and these three Defendants went in, and three -- at least three of the four were shooters, if that helps clarify.

MS. BAGSHAW:  Right.

So, the allegation is that there were four men, these three, including Mr. Prince --

MR. MCALISTER:  Mr. Prince, who we have not arrested.

MS. BAGSHAW:  -- and three shell casings.  So, it's entirely possible that -- even assuming the Government's, you know, the way they laid out the facts, that only three of the four were shooters and the fourth was not a shooter.  I just want to clarify that.

THE COURT:  Right.  My understanding is is that -- well, okay, but you're presuming that there could have been -- they only found three shell casings, but that doesn't

mean there wasn't more that they didn't find, right?

MS. BAGSHAW:  Of course, of course.

MR. MCALISTER:  That's correct.

MS. BAGSHAW:  I just want to clarify that.

THE COURT:  Okay, okay.

MR. MCALISTER:  That's correct.

THE COURT:  Okay, right.

So, I get your point.  There's four individuals, three shell casings, but the Government's theory, that I presume that they're going to have evidence, is that all four were shooting.

MR. MCALISTER:  That's our theory at the moment, Your Honor.

THE COURT:  Okay, okay.

So, Ms. Bagshaw, what I said stands.  Once you get discovery, it's without prejudice.  If you want to come back before me. I'm happy to reconsider my decision as to your client, Mr. Marshall.

MS. BAGSHAW:  Thank you, Your Honor.

THE COURT:  Anything else from anybody?

MR. MCALISTER:  No, Your Honor.

THE COURT:  Okay, thank you.

Then we're adjourned -- oh, do we want -- let's do the Arraignment, get that out of the way?

Mr. Hamm, Mr. Montalvo, Ms. Bagshaw, do you all

wish to -- have you all discussed the Indictment with your clients?

MR. HAMM:  I have.

MS. BAGSHAW:  Yes, we have.

MR. MONTALVO:  Yes, Your Honor.

THE COURT:  And do you all waive formal reading of the Indictment?

MR. HAMM:  Yes.

MR. MONTALVO:  Yes, Your Honor.

MS. BAGSHAW:  Yes.

THE COURT:  And do you wish to enter a not guilty plea and request a jury trial as to all counts?

MR. HAMM:  Yes.

MS. BAGSHAW:  Yes.

MR. MONTALVO:  Yes, Your Honor.

THE COURT:  Okay.

Shannon, do we have dates?

THE CLERK:  Yes, the motions are due October the 29th; responses, November the 5th; the pretrial conference is November the 19th at 10:30 before Judge Ellison; and the jury trial is November the 29th at 9:00 a.m. before Judge Ellison.

THE COURT:  Anything else, Mr. McAlister?

MR. MCALISTER:  No, Your Honor.

THE COURT:  Okay.

Thank you, all.

MR. MCALISTER:  Thank you.

(Proceedings adjourned at 9:40 a.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #69979*

*DATE FILED:  AUGUST 14, 2025*